Good morning, Your Honors. I'm Susan Mindenbergs. May it please the Court, I represent Danette Gonzalez, the appellant. Antoinette Davis is my co-counsel, and Ms. Gonzalez are both in the court today. Ms. Gonzalez has several of her relatives from Alaska with her as well. We are seeking reversal of the District Court's summary dismissal of Ms. Gonzalez's federal and state retaliation claims. And there are three main issues that I think that the court should consider. First, the dismissal of Ms. Gonzalez's state law claim. And secondly, subject matter jurisdiction. Do the occurrences that happen after Ms. Gonzalez filed her EEOC charge, does the court have subject matter jurisdiction over those issues? And three, whether the constellation of all of the allegations Ms. Gonzalez makes in her charge of retaliation, form of prima facie case of retaliation. With regard to the first issue of the... I'm confused about why one and three are separate. Well, one is whether or not the state law claim should have been dismissed. Right. That's just the state law claim. And three is whether the state law claims should be dismissed depends on whether or not there was a cause of action. But anyway, go ahead. But your basic claim is that the state law causes of action don't have an exhaustion requirement. That's right. That's exactly right. And I gather that Amtrak, which actually does not defend on the exhaustion ground, seems to agree to that. I don't see any argument to that effect. But the court only analyzed the allegation that was in the EEOC charge. All right. Well, that seems... Okay. Go ahead. We'll go on to... The second item is the subject matter jurisdiction issue. That's under Title VII. Yes, it is under Title VII. All right. But the court applied that restriction to the state law claim as well. We understand that. With regard to the... It is clear that a non-exhaustion claim under Title VII is a subject matter jurisdiction issue. It appears to be fairly clear in the Ninth Circuit. I think... It's quite a floppily because, in fact, there's Supreme Court law that seems to suggest that... I mean, you can waive it, for example. I mean, you can at least delay it. The timing is not subject matter jurisdiction. Right. Clearly, Title VII requires an exhaustion of administrative remedies, whether that's subject matter jurisdiction or just an exhaustion of remedies requirements. Because Amtrak does not defend the exhaustion issue. It does not. It does not. But that's the basis... If they could waive it, they waived it. Well, if they could. Right. And I wasn't sure that, with regard to the de novo review, if that should be brought up in our response. So that's why I'm addressing that issue because that's how the court actually addressed the issue. The interesting thing about the district court's analysis is that the district court found that it did not have jurisdiction over any of the subsequent acts. As a matter of fact, the district court, when it reviewed the allegations that Ms. Gonzalez put in her November 2007 retaliation charge to the EEOC, it really only... The court only looked at half of her allegations. The allegations in her EEOC charge were that she was being given retaliatory job assignments. She called it a double standard. And she took this complaint to General Foreman Mark Regal, and she said, look, I'm in retaliation for the sexual harassment and the gender discrimination claim that I brought. I'm being given all these harder, dirtier assignments. And Regal, instead of addressing the issue, threw up his hands and yelled at her, well, I guess you're going to DRO, which is their dispute resolution office. And when the court analyzed this allegation... Wait. Just a minute. You say that the EEOC charge included the discriminatory assignments. Where is that? Your Honor, she called it double standard. But where is that? The EEOC charge, unfortunately, is not in the record. But at ER 58, Ms. Gonzalez explains what she means. And at ER 117 and 118, the dispute resolution office talks about the allegation. And the court... She filed a charge with the Washington State Human Rights Commission. That was not an exhaustion of the EEOC. They're combined. The agencies are combined. So there is a charge here to the Washington State Human Rights Commission at ER 37. That's not it? Is it in the supplemental record, Your Honor? I don't know. I don't have that in my... The Washington State Human Rights Commission, and it says, I filed a complaint against Amtrak, and Mr. Rakel asked me what he asked me, and he made a harassing comment on me, and that's all it says. That is not the EEOC charge that she filed. The EEOC charge that she filed said that in retaliation for her earlier complaints, the company imposed double standard on this. How can we possibly go on in a Title VII case without the EEOC charge? You know what she filed. The EEOC charge is not in the record. I'm sorry, Your Honor. And she filed a separate EEOC charge, separate from the one that she filed with the Washington State Human Rights Commission? She filed two EEOC charges. Yes, I know. I have two Washington State Human Rights Commission charges. One is dated 2-11-2-0-7. The other is dated 10-25-2-0-7.  Well, actually, it was November 9, 2007 that she filed the EEOC charge. Right, okay, I have that. And that's the one you're talking about now? Yes, that is the retaliation charge that she filed. I need for you when you sit down to find out whether this is dated 11-9-2-0-7, and it's here. It's ER-37, you said? Right. Mm-hmm. At ER-37, I have a copy of a transcript. Maybe it's the SCR, but it's State Stamp 37. All right. What difference does it make, given the Washington State claim, and if we assume that it is not, there's no exhaustion requirement, what does it matter what's true with regard to Title VII? What difference does it make? As a practical matter. Well, as a, for the State claim? Well, for any claim. I mean, for the case. I mean, in other words, if you have a viable claim under State law, State law is not more restrictive than Title VII. No, actually it's broader, and it's more protective. So why are you worrying about the Title VII charge? Well, the remedies are somewhat different. The remedies under Federal law, obviously, contain the punitive damages component. I see. That's why. And that's really the only thing that gives an advantage to any kind of plaintiff in a case. I see. Okay. That's the reason. I'm going to address the constellation of actions, unless you want me to address the subject matter jurisdiction. No, you'd better go there. I'll go to the third one. The constellation of actions, we believe, the allegations that she makes, we believe form her prima facie. The Burlington Northern Court addressed how much harm has to be done to constitute retaliation under Title VII. And it concluded that a plaintiff must show that a reasonable employee would have found a challenge action materially adverse, which means that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. We submit that this whole constellation of actions that she alleges meets this test. Now, Amtrak, of course, disagrees. And what they say is take each one of these separate issues, take one of these eight or nine issues, and look at them independently and look at them in isolation from one another. But the Burlington Northern Court says when you're looking at material adversity, context matters. And here, context does matter. Ms. Gonzalez is the lone female employee in a workplace comprised of a small group of blue-collar workers. She alleges that when she was assigned the harder, dirtier task in retaliation for a complaint about gender discrimination and sexual harassment, the general foreman yelled at her. Next, he ostracized her. He refused to speak to her. Everybody refused to speak to her. And all the while, the company was still assigning her the harder, dirtier task that she was complaining about. I mean, there seemed to be at least some causation questions. One can infer causation in retaliation cases often. But she had been complaining about discriminatory work assignments well before she filed any charges. The issue is, and that's true, Your Honor, that is true. In fact, when she was dealing first with Minow, the person who made the crude sexist remarks about her, she was saying, look, Minow is giving me these harder, dirtier tasks. And what happens is these laborers, they're rotated through jobs. And when they're happy with the laborers and everybody's doing okay, then everybody gets rotated equally. But when somebody is doing something that the company doesn't like, then they rotate them more frequently through the specific harder, dirtier tasks. And the Burlington court said, hey, you know, it's common sense. When you're mad at somebody or when you don't want them to file a discrimination charge, give them the crummy job. But the problem is that she was contending that that was happening well before she made the charge. But the thing is, Your Honor, and I'll try to explain that, it changes. I mean, she doesn't have a set rotation. She has a rotation this week of these jobs. Ms. Chandler, I don't understand the relevance of it. All I'm saying is that it's hard to infer that the reason she – let's assume this was happening. And let's assume there's no exhaustion problem. The inference that it was happening because she filed the charge is difficult when she was complaining about it well before she filed the charge. That's my problem. Well, what she's saying is that that was in retaliation for her saying. Yes, she did. But she's arguing. What her allegation is is that at some times during the course of her employment, she was given the normal rotation. And at first she was complaining because Minow was not giving her the normal rotation. He was giving her the harder jobs. Not just Minow. She was complaining about lots of people. But then things kind of calmed down and the rotation was fine. But once she complained, and she says in her deposition testimony, that once I complained about sexual harassment, and this is the excerpt of the Record 58, she said, once I complained about sexual harassment, that double standard was then applied to me again in retaliation for my earlier complaints. And if you look at the record, what you'll see is that Superintendent Duncan says about Regal's comment and his frustration. Can you tell me where it says that? Yeah, it's in 196. I'm looking at the R58 and I'm looking for the statement that you said. Your Honor, it's 196 at the top corner of the page. It talks, I believe the retaliation has been going on since day one. And she says, I feel like they retaliated. I believe they did, yes. Yes, well, not since day one, but since this occurred in 2007. Since what occurred? The sexual remarks that Minow made. Just because I'm curious, what happened to the sex discrimination charges in this case? They were dismissed and we didn't challenge them. I see. Okay. I wanted to say just one last thing and then save a minute for rebuttal. But with regard to the causation issue, you've got two things that show causation. One is the timing alone in the Ninth Circuit can satisfy the causal nexus requirement, and that's in Stegall v. Siddle Broadcasting. But in addition to that, you also have Duncan's admission. What he says is that Regal's comment and Regal's actions, all that Ms. Gonzales complained about in November of 2007, all arose because of his frustration, Regal's frustration, with the sexual complaints that Ms. Gonzales brought about Minow. And so we know from Superintendent Duncan that, in fact, he believed that this was retaliation for her earlier complaints. Well, he believed that it was because of it. Whether he believes that it's ‑‑ I mean, the real problem here is whether ‑‑ I mean, there's no doubt that the remark was triggered by retaliation and perhaps his nonresponsiveness, noncommunication as well. But whether that is retaliation under Burlington for purposes of Title VII is a different question. Right? Well, his admission that it was ‑‑ that he believed that Regal was acting in a frustrated way. Now, is that ‑‑ what Duncan was saying is that Regal's response was in frustration, and it wasn't just the words that he said. The conduct was that she continued to get the retaliatory job assignments. Regal wasn't going to deal with that. What he was going to do is just say, oh, you know, you're going to DRO again. And that was the totality of his response. I'm angry and I'm frustrated because you keep bringing up this retaliatory job assignment. I'm not going to deal with it. Okay. You're out of time. I'll give you a minute on rebuttal then. Thank you. Good morning, Your Honors. May it please the Court. David Black representing the Amplee Amtrak. And if we think of a tribal retaliation claim as ‑‑ Let's back up. You do not attempt to defend the district court's exhaustion ruling. That is correct, Your Honor. Is that because you think it's wrong? You think it doesn't matter? Or what? We think that our arguments that we presented in the briefs will dispose of the entire case. I'm sorry? We believe that the arguments that we did tender will dispose of the entire case. Do you think the exhaustion issue is jurisdictional? I don't know, Your Honor. You don't care? No. What we have to care is the problem. I understand. So you're not being very helpful to us. I'm sorry. We can submit supplemental briefing if Your Honor would prefer. We'll see. We'll let you know. Go ahead. Thank you. I was beginning with my analogy of the red brick. Wait. One more preliminary question. Do you agree that there's no exhaustion requirement for Washington law? Yes, Your Honor. Okay. Go ahead. You're welcome. Retaliation, tribal retaliation, red brick. What the record has here, what Ms. Gonzalez has, are a bunch of loose pebbles and some wood chips. Okay. Nine items in total. Hardly the weighty material needed to make a brick, even if you put them all together. More importantly, there's nothing to bind them together. There's no causal cement to connect the loose elements so they can form a brick. Okay. I thought you were a railroad. That's true. I couldn't find a good analogy. Caboose maybe or something. Right. There's no question about the law. The three elements of retaliation have been basically unchanged for more than 20 years. That's been Hornbook law. And those elements apply regardless of whether you have one clear case of retaliation where materiality is not at issue, or whether you call to the aid of the circumstances, the totality of the circumstances, in order to establish a materiality, or whether you call upon the aid of the harassment construction, the hostile environment, by stringing together what would otherwise be minor retaliatory actions. However, neither the totality of the circumstances or the circumstances or the summation of all of these things together can supplant and get rid of the element of causation. Causation is always required or you don't have retaliation. You would think that that's just some of these events. Under Ninth Circuit law, there's sufficient showing of causation just by the timing. Do you agree with that? I'm sorry. That's just some of these events. Simply the timing would, under the Ninth Circuit law, would be sufficient to raise an inference of causation. You would have to look at the timing and you'd have to look at the particular protected conduct because the conduct that is alleged by Ms. Gonzalez is a moving ball, and it's also different things. We have her complaints about Mignot in February of 2007. We have her complaint to Regal. There was some indication in the reply brief that they may be relying upon the knowledge. But the Regal outburst, and she says you didn't talk to her after that, would appear to be sufficiently closely connected to her complaints, would they not? Sure. If the ostracism, the bright line in the Ninth Circuit, I believe, is three months. Three months is what was cited in numerous cases in the Ninth Circuit. The first case that I think we have a bright line. The Supreme Court announced a three- and four-month rule in the Breeden case, as we know, and the Ninth Circuit as recent as December of last year. Well, if the nature of the conduct. So let's suppose we don't fight about the two that Judge Berzon invoked, which were on their face seemed to be, well, certainly the Regal comment, and then the refusal to speak. Let's just take for purposes of argument that that was. They're close enough. They're close enough in time. Now, what about, where do you go? Pardon? They fail on the materiality. Because? That's supervisory snubbing. The Ninth Circuit has held it. Snubbing for filing a complaint. That's okay? In other words, if I file a complaint, the employer supervisor can stun me because I've invoked my rights? That is correct. There has to be a level of injury according to. You know, coming to work every day and having your supervisor not talk to you was not exactly. Well, the Ninth Circuit has already held that snide remarks and veiled threats from a supervisor are not enough. Certainly silence would not be enough. So he would have had to affect her assignments? He would have had to affect her terms and conditions of employment. And there's a very blatant misrepresentation of the record on this point. What Ms. Gonzalez testified to in her declaration and in the deposition was not about getting assigned dirtier or heavier jobs. She complained about the quantity of the work. If you look at the record closely, you'll see there's nowhere. It doesn't really matter. I mean, if in any respect, whether it was quantity or types of work, she was being given different work than she would have been and more onerous work because of her complaints, presumably that would be a problem. Mike, go ahead. Correct, Your Honor. But the key word is because. And because she had been complaining about this quantity of work issue from day one in 2006, we cannot say that any conduct that followed Mr. Riegel's outburst was because of the complaint. Does she say that Mr. Riegel was assigning her after this outburst unfair work? Yes, Your Honor, she does. And the ER record site for that is at ER 30. Also at ER 41. At ER 30, the Gonzalez's transcript. Well, she says it at the beginning. But what about during the relevant time period, i.e., after she made the complaint? Oh, after she made the complaint, did she ever complain about Mr. Riegel? In that regard. In that regard. With regard to assignments. No, she does not. No, she does not. Actually, that was a point that we made in our briefing. She only complained – actually, in her deposition, she was asked whether or not she could recall any other retaliatory acts by Mr. Riegel after he exclaimed, here we go again, we're going to DRO. And her testimony was, no, I cannot recall any other retaliatory actions after that point. And then I said, well, the next question in the deposition was, well, can you recall any other retaliatory acts by any other person other than Mr. Riegel? And then she proceeds to describe the workload. And if you read that, a reasonable juror could not interpret that to mean Mr. Riegel, given her prior answer, and also the fact that there are other supervisors and other people who decided the workload, including the laborers themselves. What about Mr. Duncan's yelling and charging at her in January of 2008? It's too far removed from any – You think there's a three-month cutoff? There's a three-month cutoff. November, December, January. It's three months. Right. Actually, I take that back. You say it's really an automatic impermeable line. It's not an impermeable line. I think, though, if you're at the outskirts of that timeframe, you need more evidence to demonstrate a causal connection, because that's at 92, 93 days. Suppose we didn't agree with that, then what? I'm sorry? Suppose we thought that the timeframe was sufficient for the inference, then what? And then I think it falls back on the materiality issue again, and you have to look at the context, the totality of the circumstance, and you look at who Mr. Duncan is. At that point, we would have Riegel's comment to her, which clearly was retaliatory whether it was material, he's not talking to her, she says, and Duncan yelling at her all within a three-month time period. Would that not be sufficient to start setting up a house-to-work environment claim? If you had one more element, and that element would be something, some piece of evidence to tie those together, because right now you have these discordant actors that are acting. Duncan was Riegel's supervisor, is that right? That is correct. And the person to whom she complained about Riegel earlier. Correct. But he was also her advocate and the one who tried to get Noe fired. So when you talk about considering the totality of the circumstance, one must consider things that Duncan tried to do to help Ms. Gonzalez. He was her advocate. He's the one who stepped up the initial written discipline from Ricky D'Onofrio. He upgraded it to formal charges so that he could try to get Noe fired. What happened with regard to the Noe issue is somewhat relevant to all this, right? Because one of her claims is that she would complain and they wouldn't do anything. Well, they tried to. They tried to get Noe fired, but the union fought it and was successful at the hearing in December. Essentially because the company screwed up. Because there was a delay in time. Right. But at her deposition, Ms. Gonzalez characterized the attempt to rid Mr. Noe, to rid the workplace of Mr. Noe as a witch hunt, with Mr. Noe being the witch, because Mr. Duncan was trying to get rid of him. And now she's claiming in this follow-up suit that Mr. Duncan is now retaliating against her for making those claims, which is at odds with what the record demonstrates. Even in, this is not a case of Ray V. Henderson, where you have an amalgamation of retaliatory events that are enacted by the same people. In the Ray V. Henderson case, you had two supervisors. You had the postmaster general and you had the direct supervisor who were basically in cahoots. And the court focused on the conduct that linked up their retaliatory acts to the protected conduct. And there was an express finding of causal connection in that case. You don't have that here. You have a bunch of different things. You have two supervisors. You have a food vendor. You have co-workers, some unnamed, some named. And they're trying to piece together this retaliatory conspiracy without any evidence in the record that they're connected. That's the problem that Amtrak has with this case and this theory. I think we understand your argument, unless you have something to add. Okay. Just again, in addition to, there's one other record characterization I wanted to address. And the reply at page 8, Ms. Gonzales states that Regal and co-workers shunned and taunted her at safety meetings. And that, I thought, would give the court something to look at. And they would think that, oh, there are these additional things by Regal after the comment. But that's not true. There's no evidence tying Regal to the meetings. There's only one meeting, first of all, not meetings, plural. And that was on December 24th. That was in paragraph 34 of Ms. Gonzales' declaration. I ask if you know whether the complaint that's in the record, either SCR 37, I guess, to the Washington State Human Rights Commission, there's another one at, which is page 24. Are those the two relevant charges? I don't have the same record citations that Your Honor referred to. Well, are the charges in the record? Not that they're not. Well, I have to find out why. But I have them here. All right. Thanks. All right. Thank you. Thank you. I just have one comment to make with regard to timing. Have you found out what these charges are? I don't know, Your Honor. I don't have them in the record either. Thank you. Yeah. With regard to the timing issue, Ms. Gonzales made her complaint in November of 2007. Mark Regal stopped speaking to her. Everyone else at the workplace stopped speaking to her. On December 24th, 2007, she was yelled at in a safety meeting. All right. Is there any evidence that she told anybody that other people weren't talking to her, any supervisor who couldn't do anything about it, that her coworkers weren't talking to her? This was a relatively small workforce, Your Honor. No, I don't believe there's anything in the record that says she told somebody about it. But Regal was the general foreman, and he wasn't speaking to her. So no one was speaking to her. And then in January of 2008, which is within 60 days of the time that she complained, this is when Duncan came charging at her. But one thing I did want to note, during this time, and what Ms. Gonzales complained specifically about was being rotated into steam cleaning engines. She said, I'm doing that all the time. She went to Duncan and she said, look, this is retaliation. I'm being assigned this. Where is that in the record? It's at 85, ER 85. And Duncan testified at his deposition that he did nothing about this. In ER 85, as far as this is? ER 85, yes, Your Honor. Okay. I thought her deposition was over before that in the ER, no? I'm sorry, Your Honor, it's in Mr. Duncan's deposition. Yeah. And he's the one that admitted that. The time frame is a little unclear, but it looks like it's between June and September of 2008 that the steam cleaning assignments were given to her. Okay. All right. Thank you. We appreciate the arguments, and the case is submitted.
judges: Tashima, Fisher, Berzon